**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHAPMAN KELLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 04 C 07715** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **CHICAGO PARK DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

On April 2, 2007, this Court, upon its own motion, entered an order directing the parties to brief the following issues: (1) diversity jurisdiction; (2) whether a garden is "copyrightable" under U.S. copyright law and is therefore protectable under the U.S. Copyright Act or the Visual Artists Rights Act at 17 U.S.C. § 106A; (3) whether a garden is defined as a visual work of art under the Visual Artists Rights Act at 17 U.S.C. § 106A; and (4) assuming the Defendant acquiesced in the display of the exhibit after the permit expired, the legal significance of such continued display. For purposes of this opinion, the Court will accept all of Kelley's allegations as true and will draw all reasonable inferences in his favor.

## INTRODUCTION[1]

Chapman Kelley ("Kelley") is a nationally renowned artist who was granted a permit by the Chicago Park District ("Park District") to create a work of art called "Wildflower Works" in Grant Park in 1984. Kelley moved to Chicago, thus becoming a citizen of Illinois, and began

_____

[1] These facts are taken from the Complaint.

work on the Wildflower Works exhibit. The permit was renewed in 1988, 1990 and 1993. The project required the annual cutting of flowers, trimming and replanting. In or about 1994, Kelley had a discussion with Commissioner Burroughs of the Park District. In response to Kelley's questioning about the vitality of the exhibit, Commissioner Burroughs responded rather cryptically that it was still there. Kelley took that response to mean that the permit was being renewed orally. After the temporary permit expired, Kelley was allowed to maintain his exhibit without any formal permit and the Park District continued to display it. After receiving notification in 2004 that the Park District was continuing the project as usual, he expended resources preparing for the replanting. Without giving any notice, the Park District removed Kelley's plantings, fenced off the area and therefore, destroyed his artistic work.

While still a citizen of Illinois, Kelley filed a four count complaint against the Chicago Park District. Kelley alleges in Counts I and II that the Park District violated the Visual Artists' Rights Act by removing his plantings. He seeks damages to his reputation and integrity as well as statutory damages and attorneys' fees for the willfully destructive acts of the Park District pursuant to Section 504 of the United States Copyright Act. In Count III, Kelley sought just compensation for the unlawful taking by the Park District of Kelley's property interest in the Wildflower Works under Due Process Clause of the United States Constitution. Count III was dismissed in a separate order of this Court. In the final Count IV of the complaint, Kelley alleges breach of a contract existing between he and the Park District and he seeks the fair market value of materials removed from the Wildflower Works display.

**DISCUSSION**

**A. Copyrightability of Wildflower Works**

According to 17 U.S.C. § 102 of the Copyright Act, in general:

> copyright protection subsists in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  Works of authorship include the following categories:
> (1) literary works;
> (2) musical works, including any accompanying words;
> (3) dramatic works, including any accompanying music;
> (4) pantomimes and choreographic works;
> (5) pictorial, graphic, and sculptural works;
> (6) motion pictures and other audiovisual works;
> (7) sound recordings; and
> (8) architectural works.

VARA only protects artists' rights in "works of visual art," which is a term supplied the statute

that encompasses a select few "works of authorship."  It defines the term "work of visual art" to

include:

> (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or
> (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

VARA specifically excludes the following from "work of visual art":

> (A) (I) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;
> (ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;
> (iii) any portion or part of any item described in clause (I) or (ii);
> (B) any work made for hire; or
> (C) any work not subject to copyright protection under this title.

The plain language of the Copyright Act show that a landscaped garden is probably not a "visual work of art" nor a "work of authorship." If all that the law required was that courts determine what is (and what is not) art, then the law, like beauty, would be in the eye of the beholder. Fortunately both VARA and the Copyright Act (perhaps recognizing the artistic limitations of judges) provide slightly more manageable standards.

*1. Copyrightability*

Kelley addresses the issue of whether the Wildflower Works display was copyrightable by contending (for the first time in almost three years of litigation)[2] that Wildflower Works was a "sculpture" and thus, as a "sculptural work," copyrightable. The Copyright Act does not define the term "sculpture." Absent a statutory definition or a clearly expressed legislative intent to the contrary, words are to be given their plain and ordinary meaning. *United States v. Lock*, 466 F.3d 594, 598 (7th Cir. 2006) (citing *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982). According to one common dictionary, a sculpture is "a work of art created by the practice of shaping figures or designs in the round or in relief, as by chiseling marble, modeling clay, or casting in metal." *The American Heritage® Dictionary of the English Language*, 4th Ed., Houghton Mifflin Company, 2004. Another dictionary defines a sculpture as a three-dimensional work of art created by processing (as by carving, modeling, or welding) plastic or hard materials. *Merriam-Webster's Online Dictionary*, retrieved August 13, 2007, from http://www.m-w.com/dictionary/sculpture.

---

[2] In fact throughout the entire Final Pre-Trial Order submitted to this Court, including both the stipulated facts and the contested issues of law and fact, is it nowhere asserted that the display was a sculpture.

There is no marble, clay, plastic, metal or other hard materials that have been carved, molded, chiseled, welded or cast in the Wildflower Works exhibit.  Instead, it consists of an arrangement of living plants within confined spaces or as stated in Schedule A to the Final Pre-Trial Order, "two elliptical shapes formed by gravel and metal edging surrounding two beds of wildflowers."  Kelley's allegations in his complaint and pictorial exhibits attached thereto confirm that the display consisted of flowers growing in bounded elliptical areas in Grant Park.  According to Kelley, the display required annual cutting, trimming and replanting of flowers.  Despite the incongruence of the activities involved in maintaining an arrangement of living flowers with the activities described in the definitions of "sculpture," this Court will not conclude that such an arrangement of living plants can never be a sculpture *per se*.  To do so would ignore such exquisite examples of living art as topiaries, which are created by clipping and trimming living plants, usually bushes, into exotic shapes.

However,  based upon the facts presented and the absence of relevant briefing by the parties, this Court cannot find that Kelley's Wildflower Works display was not a sculpture.  Although planting seeds, cultivating and pruning wildflowers in an ellipse-shaped garden does not easily equate to the process of sculpting a tangible piece of art, it cannot be denied that at a minimum, Kelley shaped the flowers into the forms of ellipses.  The process of planting, cutting, trimming and replanting flowers seems much more likely to constitute gardening or landscaping, but the manipulation of the flowers into shape fits within the general definition of "sculpting."

Kelley characterizes the exhibit as an "environmental sculpture" because it involved the alteration of earth.  However, merely altering the earth cannot by itself differentiate the exhibit from other landscaping and gardening projects because they all involve altering the earth in some

form or fashion. He states the display is a sculpture, but he declines to state what the sculpture represents or what it expresses. Any work of authorship, be it a drawing, painting, or sculpture, has to express something, however abstract it may be, before it can be considered copyrightable. *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (recognizing that copyright only protects expression); *see also Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 556 (1985). It seems as though Kelley's wildflowers in Grant Park depict nothing more than wildflowers in a park growing in two large ellipse-shaped areas. The aesthetic impact of the arrangement is difficult to measure.

Further complicating the determination of copyrightability is that Kelley does not explain what about the exhibit is copyrightable. Is it the design? Is it the actual flower beds? Nor does he address how the exhibit satisfies the basic requirement of copyright that the work in question be original (i.e.- result from independent creation). 17 U.S.C. § 102. Kelley leaves this Court to assume that he is the first artist to ever conceive of and express an arrangement of growing flowers in ellipse-shaped enclosed areas in a public park in the manner in which he created his exhibit. Perhaps he was. Someone must have believed that the Wildflower Works display was a beautiful, aesthetically pleasing exhibit that definitely added an artistic touch to an otherwise boring urban space, but at this juncture this Court cannot determine whether it was a sculptural work under the Copyright Act. Kelley conceded in his brief that whether the Wildflower Works display was a "sculpture" as the term is used in VARA and the Copyright Act is for this Court to determine. This Court will require the parties to fully address all facts bearing on the question before making a final determination that Wildflower Works was not a sculpture and not copyrightable.

## 2. *Work of Visual Art under VARA*

As stated earlier, VARA only protects those works of art that are also "works of visual art. 17 U.S.C. § 106A. Thus assuming *arguendo* that Wildflower Works was a sculpture, Kelley will have to demonstrate that it is protected by VARA.

Kelley's first argument is that Wildflower Works is a "work of visual art" protected by VARA because it was intended for exhibition use only. Kelley cites *NASCAR v. Scharle*, 356 F. Supp. 2d 515, 529 (E.D. Pa. 2005) in support of this proposition. Kelley's readings of *NASCAR* and of VARA are incorrect. Nowhere in the *NASCAR* opinion did the court find that a work of art comes within the protection of VARA simply because it was intended for exhibition use only. Nor does VARA itself state this. In *NASCAR*, the alleged work of visual art was a series of technical drawings of a trophy with no mention of the intended use of the drawings. *See id.* at 516. In fact, the court found that because technical drawings are specifically excluded from "works of visual art" under VARA, Sec. 101, the statute was completely inapplicable. *Id.* This Court fails to see how *NASCAR* applies to the facts here other than to militate for dismissal of the claim.

In *NASCAR*, the court found that technical drawings are specifically excluded from those works of authorship that can de deemed to be "works of visual art." Here, although landscaped gardens are not specifically excluded from the definition, the Park District argues they nonetheless fall into the excluded categories of either "applied art" under VARA or "works not otherwise subject to copyright protection" under the Copyright Act.[3] VARA, Sec. 101; *see also*

---

[3] Wildflower Works does not fit into the category of "work made for hire," nor has the Park District so argued. A finding that the exhibit was a "work made for hire" would require the following factors to be satisfied: 1) Kelley must have been an employee of the Park District; or

17 U.S.C. § 101 (categorizing those works of authorship that are subject to copyright and <u>not</u> including gardens or floral arrangements).

Even though the Copyright Act provides that the term "sculptural work" encompasses "applied art," VARA excludes "applied art" from "works of visual art."  The Park District contends the Wildflower Works display is "applied art," but it does not offer any definition for the term nor any explanation of how the display fits into this category.  The Second Circuit Court of Appeals has described "applied art" as "two- and three-dimensional ornamentation or decoration that is affixed to otherwise utilitarian objects." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 84 (2nd Cir. 1995) (citation omitted).  The Seventh Circuit has not defined "applied art," but has explained that the term includes those certain useful articles of manufacture or other utility that incorporate artistic craftsmanship and expression.  *See Pivot Point Intern., Inc. v. Charlene Products, Inc.*, 372 F.3d 913 (7th Cir. 2004).  Finally, according to Professor Nimmer, "[w]orks of applied art are said to 'encompass all original pictorial, graphic, and sculptural works that are intended to be or have been embodied in useful articles, regardless of factors such as mass production, commercial exploitation, and the potential availability of design patent protection.'"  1-2 Nimmer on Copyright § 2.08.

Thus, for this Court to find that the display is a work of "applied art," it would first have to determine that a public park is a "utilitarian object" or that the work itself was an article of manufacture or some other utility.  The display consisted of flowers affixed to the ground in an

---

2) an independent contractor and the work was commissioned or specially ordered by the Park District, a written agreement between the parties specified the work was made for hire, and lastly, the work fits into one of nine categories included in the statutory definition.  17 U.S.C. § 101.

urban public park.  Kelley's complaint explains that the exhibit's sole purpose was to beautify

the area above the East Monroe Parking Garage in Grant Park.  There are substantial examples

of urban centers beautifying public parks through garden design.  *See e.g.*

http://www.publicgardendesign.com/projects/index.htm.  Since the sole use of the display was to

beautify- an indisputably non-utilitarian function- this Court declines to find that Wildflower

Works was a work of "applied art."[4]

Next, Kelley argues that his work is a "work of visual art" because he (Kelley) is an artist

of recognized stature.  This is incorrect.  The unambiguous text of VARA itself forecloses this

argument: "The author of a *work of visual art...*  shall have the right... to prevent any destruction

of a work of recognized stature, and any intentional or grossly negligent destruction of that work

is a violation of that right."  17 U.S.C. § 106A(a)(3)(B) (emphasis added).  In short, the question

of whether the author of the work is of recognized stature is not determinative of whether VARA

applies to it.  The work at issue must also be found to be a "work of visual art."

Including floral arrangements of living plants within the meaning of the term "sculpture"

seems to be at odds with the purpose of VARA.  VARA's recognized purpose is to preserve an

artist's "work of visual art."  *See e.g. Bd. of Managers of Soho Int'l Arts Condo. v. City of New

York*, 2003 WL 21403333, at *10 (S.D.N.Y. 2003) (recognizing that VARA's purpose is to

preserve works of visual art because the statute gives the artist the right to prevent distortions,

mutilations, or other modifications to the work, subject to certain exceptions).  Because

---

[4] This is not to say that a flower garden could never serve some utilitarian function. The
fact is that here, the display does not even aid the park's utility as a vehicle for active recreation
(e.g.- jogging, playing), as opposed to passive recreation (e.g.- relaxing while watching an
aesthetically pleasing array of flowers).

Wildflower Works was made up of an arrangement of living plants in Chicago, a city notorious for its harsh winters, preservation even as to perennial plants is problematic.

Similarly, VARA requires that "in the case of sculptures, in multiple cast, carved, or fabricated sculptures of 200 or fewer," each sculpture should be "consecutively numbered by the author and bear the signature or other identifying mark of the author." This requirement would have little meaning when applied to an arrangement of flowers because ordinarily flowers do not bear signatures or other identifying marks.[5] Yet one can just as easily argue that the signature requirement merely applies to those types of "sculptures" instead of limiting the population of what works of art can be deemed "sculptures."

Another issue not touched on by the parties is whether Wildflower Works is "site-specific art." The significance being that site-specific art was been held to not be protected by VARA. *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 130 (1st Cir. 2006). A work of art is "site-specific" if it is intrinsically linked to a location such that the artistic expression could not exist outside of and without the location. In *Phillips*, the artwork at issue consisted of several confirmed sculptures and a series of rocks and stones that had been worked upon and placed in a park. *Id.* The court recognized the artist's work with placing sculptures within the park and landscaping as site-specific art because it integrated location as an element of the artwork and if removed from the location, the work would be destroyed. *Id.* at 140; *see* 3-8D Nimmer on Copyright § 8D.06. The court then held that VARA does not protect site-specific art. *Id.* at 143. Although this Court is not bound by the decisions of other circuits, due weight is

---

[5] Nor has Kelley introduced any evidence of signature or identifying marks placed on each flower.

accorded to their reasoning and standards, especially when dealing with areas of the law that the Seventh Circuit has yet to consider.  Based upon the *Phillips* holding, even if the Wildflower Works display was a sculpture,  it still would not come within the protection of VARA.

The wildflower display was obviously specific to that location in Grant Park because the flowers were growing out of the ground.  A crucial question is whether the flowers would lose their essential nature if they were transplanted to a different location.  If it is true that any artistic expression caused by the flowers would not and could not exist without the ground in which they were planted, then the display is site-specific and not protected by VARA.  But it is not self-evident the Wildflower Works exhibit could not exist without the park ground and so parties must present argument on the nature of the display before this Court will find that it was site-specific and not protected by VARA.

In conclusion, this Court declines to find that Wildflower Works was not copyrightable under the Copyright Act as a "sculpture"  and not protected under VARA as a "work of visual art."

## B. Diversity Jurisdiction

Kelley also alleges diversity jurisdiction and states that diversity exists in this action because, although he and the defendant were both citizens of Illinois at the time of filing this action, Kelley moved to Texas for legitimate reasons afterwards during the course of this litigation.  In general, diversity of citizenship is determined based upon the facts as they existed at the commencement of the suit.  *Smith v. Sperling*, 354 U.S. 91, 93, n. 1 (1957) (citations omitted); *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 130 F.3d 290, 292-293 (7th Cir. 1997) (citations omitted).  Once a court has established jurisdiction over a matter by way of

diversity of citizenship, that court cannot be <u>divested</u> of such jurisdiction due to a change in the citizenship of any of the parties. *Louisville, N.A. & C. Ry. Co. v. Louisville Trust Co.*, 174 U.S. 552, 566 (1899) (citations omitted). Conversely, diversity of citizenship cannot be <u>established</u> by conditions occurring subsequent to the time of the filing of the suit. *Lyons v. Weltmer*, 174 F.2d 473 (4th Cir. 1949); *Seaboard Finance Co. v. Davis*, 276 F. Supp. 507, 510 (N.D. Ill. 1967); 13B Wright & Miller, *Federal Practice and Procedure*, §3608 at p. 454, (2nd ed. & Supp. 2007).

Kelley argues that a litigant can establish diversity jurisdiction in a federal lawsuit *after* the action is commenced by simply moving out of state for legitimate reasons. He cites *City of Indianapolis v. Chase National Bank* in support of his proposition. *See* 314 U.S. 63 (1941). In that case, the Supreme Court held that when determining whether diversity jurisdiction exists, the court must look to the "principal purpose of the suit" rather than depending on "mechanical rules." 314 U.S. at 69. However, the issue and facts presented in *City of Indianapolis* differ so greatly from the issue and facts presented here that the Court's holding there is totally inapposite here. In *City of Indianapolis,* the issue centered on the adversarial alignment of several parties at the time the case was filed. *See* 314 U.S. at 71. Here, the issue centers on the residency of one of the parties at the filing of the suit.

There, the plaintiff, Chase Bank sued the City of Indianapolis (the "City"), Indianapolis Gas and Citizens Gas for a declaratory judgment and specific performance of obligations arising under a lease for property. 314 U.S. at 70. Citizens Gas was created to compete against Indianapolis Gas in the market for delivering energy to the City. *Id.* Its franchise provided for it to only exist for a finite duration and to convey all of its property to the City upon winding up and dissolution. *Id.* At some point, Indianapolis Gas leased certain gas plant property to

Citizens Gas for a term that was longer than the time allotted for Citizens Gas to remain in existence. *Id.* Upon winding up its business, Citizens Gas conveyed all of its property to the City. *Id.* Though it took possession of the property, the City refused to honor any obligations arising under the original lease entered into between Indianapolis Gas and Citizens Gas. 314 U.S. at 71. Chase Bank, a non-citizen of Indiana, was the trustee of a mortgage deed that secured a bond issue by Indianapolis Gas prior to its lease with Citizens Gas. *Id.* Lease payments made by Citizens Gas were used to pay down bond indebtedness and the lease itself as security under the mortgage deed. *Id.*

The district court found that the interests of Chase Bank and Indianapolis Gas were the same (or at least not adversarial) <u>at the outset of the case</u> and so it realigned them as co-plaintiffs. *Id.* While Chase was the sole plaintiff, there was complete diversity of citizenship among the adverse litigants. *Id.* But, with Indianapolis Gas realigned as a plaintiff, the district court found that diversity was lacking, so it dismissed the case. *Id.* The Seventh Circuit reversed and remanded. 314 U.S. at 71. Chase then filed a supplemental bill alleging Indianapolis Gas defaulted on its lease payment obligations. *Id.* at 72. The district court reached the merits of the claims and ruled against Chase and Indianapolis Gas. *Id.* The Seventh Circuit again reversed the district court on appeal. 314 U.S. at 72. The Supreme Court then granted certiorari to resolve the jurisdictional question. *Id.*

The Supreme Court held that Chase's supplemental allegations against Indianapolis Gas were simply "window-dressing designed to satisfy the requirements of diversity jurisdiction," and that the "primary and controlling issue" in the matter was whether the lease conveying property to Citizens Gas was valid. *Id.* Thus, in holding that the matter should have been

dismissed for want of jurisdiction (thereby affirming the district court), the Court explained that when courts are determining whether diversity jurisdiction exists, they must look to the "principal purpose of the suit" <u>at the commencement of the action</u> rather than depending on "mechanical rules." 314 U.S. at 69.

So in *City of Indianapolis*, the Court settled the issue of whether jurisdiction based on diversity of citizenship of the litigants remains where the litigants' adversarial alignment satisfied complete diversity at the outset of the action, but did not once the litigants were realigned by the court. The Court did not deal with the specific issue before this Court now- whether a court has diversity jurisdiction over a suit filed by a plaintiff who filed while he and the defendant were both citizens of the same state but then subsequently became a citizen of another state. Contrary to Kelley's assertion, the Court in *City of Indianapolis* never held (or even mentioned) that a plaintiff residing in the same state as the defendant at the time of filing the case can keep the case in federal court on diversity jurisdiction grounds by moving out of state afterwards. Kelley instituted this action while he and the defendant were both citizens of Illinois. Therefore, there was no diversity jurisdiction at the outset of the case and there is none now, despite that fact that Kelley has since become a citizen of Texas.

**C. The Legal Significance of the Continued Display of the Exhibit after the Permit Expired**

Kelley argues that the Park District breached its contract with him when they removed his plantings without providing him any notice. The initial permit issued in 1984 and provided that the Park District could not remove the exhibit without providing 90 days notice. That permit expired and the Park District issued several formal temporary permits; each permit

extending the initial permit. In 1994, the last temporary permit expired. However, the Park District continued to display the exhibit after the expiration of the last permit.

Kelley argues that the Park District's continued display of the exhibit after the last permit terminated is proof that the parties were still operating under the terms of the permit and that the requirement of obtaining a formal permit was waived.[6] Kelley cites a string of Illinois cases, each dealing with oral modifications to written contracts, for the proposition that "an oral extension of the written permit is a valid modification of the permit and the Statute of Frauds." *See Rose v. Dolejs*, 116 N.E.2d 402(Ill. 1953); *Heitz v. Circle Four Realty Co.*, 548 N.E.2d 11 (Ill. App. Ct. 1989); *Wysocki v. Bedrosian*, 463 N.E.2d 1339 (Ill. App. Ct. 1989). However, none of the cases cited by Kelley deals with municipal permits; rather they all deal with land sale agreements or oral agreements to pay money. He cites nothing on the issue of what legal consequences flow from the Park District's continued display of the exhibit after the permit expired.

The Park District argues that the continued display of the exhibit has no legal significance whatsoever. Although it is not clear that Kelley is advancing an equitable estoppel theory, the Park District asserts that Kelley cannot successfully do so because in addition to Illinois courts' general disfavor of applying estoppel to municipal entities, *see Miller v. Town of Cicero*, 590 N.E.2d 490 (Ill. App. Ct. 1992), none of the requisite elements of an estoppel claim are present. First, a plaintiff must show that the municipal entity committed an affirmative act that induced substantial reliance. *Lindahl v. City of Des Plaines*, 568 N.E.2d 1306, 1316 (Ill.

---

[6] He also argues that it is proof that the Park District believed VARA applied to the exhibit.

App. Ct. 1991). Second, the affirmative act must be an act of the entity and not an unauthorized act of a ministerial officer or a ministerial misinterpretation. *Id.* This Court will assume that Kelley's position must be the affirmative act was either the continued display of the exhibit or Commissioner Burroughs cryptic response that the exhibit was still there.

This Court reads Kelley's contentions that the Park District "agreed to the continued use of the display without a permit" and "did not follow its own procedures for the issuance of permits" as an argument that he had an implied contract based on the Park District's continued display of the exhibit and the terms of that implied contract are the same as the terms embodied in the original permit.

In Illinois, "no contract or liability may be implied against a municipal corporation where there has been a <u>failure to comply with a statute or ordinance</u> prescribing the method by which an officer or agent can bind such corporation by contract." *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 519 N.E.2d 1005, 1007 (Ill. App. Ct. 1988) (citation omitted). Only "corporate authorities" can execute contracts that bind the municipal entity unless there has been an express delegation of that power. *Chicago Food Mgmt. v. City of Chicago*, 516 N.E.2d 880 (Ill. App. Ct. 1987). The Park District argues that under 70 Ill. Comp. Stat. 1505/7.01, only the <u>Board of Commissioners</u> of the Park District has the power to issue a renewal permit involving more than a limited, short-term use of Park District property. But the statute actually provides that "[t]he *commissioners* of such district constitute the *corporate authorities* thereof, and have full power to manage and control all the officers and property of the district, and all parks, driveways, boulevards and parkways maintained by such district or committed to its care and custody" (emphasis added). From the language of the statute it would

seem that if Commissioner Burroughs was the commissioner of the district in which Grant Park

sits, then he was the "corporate authority" capable of binding the Park District in contract and he

could do so orally. *See Chicago Food Mgmt. v. City of Chicago*, 516 N.E.2d 880.

The Park District's position can be summarized as follows: if either the continued display

of the exhibit or Commissioner Burroughs' oral statement were implicit agreements to extend a

renewal permit, such agreements would be invalid because the power to grant an extension or a

permit rests solely with the Board of Commissioners. Thus, the Park District cannot be bound to

the notice requirements or any terms of the original permit.

In *McMahon v. City of Chicago*, an Illinois appellate court declined to find a breach of

contract in a similar case where a city employee made an oral promise to the plaintiff that

purportedly bound the City. 789 N.E.2d 347, 352 (Ill. App. Ct. 2003). The court held that

implied contracts are not recognized in cases involving municipalities: a contract cannot be

implied if the <u>statutory method</u> of executing a municipal contract has not been followed.

This Court finds that the continued display of the Wildflower Works exhibit after the

permit expired cannot constitute an implicit agreement of the Park District to adhere to the terms

of the original permit. However, Commissioner Burroughs, as the corporate authority for the

district in which Grant Park sits, could bind the Park District the contract or extend a permit for

use of park land.

**CONCLUSION**

Wildflower Works may not have been copyrightable subject matter under the Copyright

Act, nor a"work of visual art" under VARA, but there has not been enough information

presented for the Court to make that determination.  There is no diversity of citizenship

jurisdiction because both Kelley, the plaintiff, and the Park District, the defendant, were citizens

of Illinois at the commencement of the action.  The Park District has submitted authority tending

to show that the continued display of the exhibit could not constitute an implicit agreement on

the part of the Park District.  However, an oral promise by the Commissioner of the district in

with the park sits could bind the Park District.  Therefore, all of the remaining counts of the

Complaint will proceed to trial.


/s/ David H. Coar                                   
David H. Coar
United States District Judge


Dated: **September 14, 2007**