## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**CHAPMAN KELLEY,**     *     **Case No. 04C 7715**

    **Plaintiff,**     *     **Judge David H. Coar**

**VS.**     *     **Magistrate Judge Mason**

**CHICAGO PARK DISTRICT,**

    **Defendant.**


## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

### JANE JACOB

1.     Jacob is qualified to testify as an expert of art, having worked more than 20 years with four major art institutions: Dallas Museum of Art, Worcester Art Museum, Frank Lloyd Wright Home Studio and Museum, and as Deputy Director of the Terra Museum of American Art in Chicago; having been in the art business for more than 30 years; presently a professor of art history at NYU; and, the owner of Jacob Fine Art. (Rep. Rec. Pg. 9, lines 15-22)

2.      Jacob examined Kelley's Wildflower Works project through a thorough examination of well-defined terms. (Rep. Rec. Pg. 10, lines 16-25)

3.      Jacob's concluded and through her testimony proved Kelley's project is a work of art. (Rep. Rec. Pg.. 11, lines 1-2, lines 23-24)

4.      Jacob applied the tariff laws to define what is art by considering the appearance of the object, Kelley's occupation as an artist and the purpose of the object. (Rep. Rec. Pg.. 11, lines 10-20)

5.      Jacob concluded that Chapman Kelley is a well-known artist. (Rep. Rec. Pg. 12, lines 1-11)

6.      Jacob concluded that Kelley conceived the whole project as a work of art to be installed on the land provided him by the Chicago Park District. (Rep. Rec. Pg. 12, lines 12-15)

7.      At no time did Jacob hear the project referred to as a garden. (Rep. Rec. Pg. 40, lines 1-2)

8.      Jacob testified that what may be conceived by some as a garden can definitely be conceived by others as a "work of art." (Rep. Rec. Pg. 13, lines 20-21)

9.      Jacob concluded Kelley's project is a work of art in every sense because it's also been written about in numerous art publications as

art it is accepted in the art field as art and was produced by someone who makes his living creating art. (Rep. Rec. Pg.. 30, lines 24-25, Rep. Rec. Pg. 31, lines 1-6)

10.     Jacob quoted famous artist Andy Warhol describing art as "anything you can get away with." (p. 14, line 7-8).

11.     Jacob referred to Ayn Rand's book entitled <u>What is Art: The Esthetic Theory of Ayn Rand</u>, as well as the <u>Bullfinch Dictionary of History</u> to describe how art's definitions have changed since WWII. (Rep. Rec. Pg. 15, lines 8-10, lines 14-22)

12.     Sculpture before World War II was art carved out of wood, sculpted from clay, formed from clay or plastic. (p. 15, lines 14-17) But since World War II and the 1960s more specifically, the definitions changed, including the current definition of sculpture "as any non-two dimensional art form". (Rep. Rec. Pg. 16, line 1)

13.     Jacob concluded that Kelley's art is also a painting, that the work has been described as a painting since its inception and was initially conceived as a painting (Rep. Rec. Pg.17, lines 16-18).

14.     Jacob asserted that the Wildflower Works is a two-dimensional painting when viewed from an airplane above (Rep. Rec. Pg. 18, line 17).

3

15. The work is also a three-dimensional painting from the ground, noting that many paintings are three dimensional. (Rep. Rec. Pg. 18, lines 22-23)

16. Jacob concluded Kelley's work can not be site specific because it could have been installed in any number of sites, and it would have still been the same installation.

17. Jacob concluded the site was not necessary to create the work of art. (Rep. Rec. Pg. 20, line 25, Pg. 21. lines 1-5).

18. Jacob agreed with the Court that this work is not applied art. (Re. Rec. Pg. 21, line 15).

19. Jacob concluded that the work of art could have been moved within the park, even in its entirety, and therefore is not site specific (Rep. Rec. Pg. 50, lines 5-12, Pg. 55, lines 10-14)

20. Jacob completely disagreed with the suggestion that once a work of art is integrated into a certain environment its removal destroys the artist's concept. (Rep. Rec. Pg. 56,line 48)

21. Jacob cited the works of artist Richard Serra as art that was specifically installed in one museum, then was disassembled, restructured and installed elsewhere – explaining that it happens all the time. (Rep. Rec. Pg.57, lines 1-7)

22. Jacob applied Section 602 of the Visual Artists Rights Act of 1990 to define Kelley's Wildflower Works as both a painting and a sculpture (Rep. Rec. Pg.22, lines 9-14)

23. Jacob quoted what is not visual art under VARA, Section A, Subsections 1 and 2 to include any poster, map, globe, chart, technical drawing and numerous other forms of drawings and publications unrelated to artistic value. (Rep. Rec. Pg. 24, lines 12-24)

24. VARA was designed to protect the integrity of the artist's work (Rep. Rec. Pg. 25, line 23).

25. VARA's purpose is to prohibit others from altering or destroying works of art without permissions. (Rep. Rec. Pg. 25 lines 24-25, Rep. Rec. Pg. 26.line 1).

26. Many well-known people, artists and publications have referred to Wildflower Works as art. (Rep. Rec. Pg. 27-28).

27. The sketches and the plans for the Wildflower Works project are included in the archives of the Smithsonian Institution in Washington, DC. (Rep. Rec. Pg. 27, lines 1-2)

28. Kelley's Wildflower Works has been written about all over the world in high praise. (Rep. Rec. pg. 27, lines 3-4)

29.   The Hirshorns have made statements in public and in public forums about the work. (Rep. Rec. Pg. 27, lines 4-6)

30.   The City of Chicago embraced the work on their banners to promote the city, referring to Kelley's art as a painting in written public brochures. Other tourism facts of the City of Chicago, including hotels as late as 2006 this wildflower work as an attraction to the City of Chicago. Other artists have written about it. And it was highly publicized the time of its lifetime as a painting and a valuable installation work of art in the City of Chicago. (Rep. Rec. Pg.27, lines 7-18)

31.   Jacob is aware of many occasions when the Chicago Park District referred to Kelley's work as a painting. (Rep/ Rec. Pg.16, lines 24-25, Rep. Rec. Pg.17, line 1)

32.   Wildflower Works was not commissioned art. (Rep. Rec. Pg. 290., lines 18-22)

33.   Wildflower works falls under the category of experimental materials as artists since the 1960's have sought new, original materials with which to work.(Rep. Rec. Pg. 30, lines 8-13)

34.   Jacob testified that all paintings, even those on canvas, are constantly changing and there is no rule in art that says the materials ever have to

be fixed. (Rep. Rec. Pg.36, lines 24-25, Rep. Rec. Pg. 37, lines 1-5, 8-0)

35. Jacob described Kelley's art as an example of how a piece can be art even if it is constantly changing in an unpredictable way. (Rep. Rec. Pg. 52, lines 3-5)

36. Jacob's expert opinion was that two elliptical shapes of Kelley's art garden never changed while bounded by cortin steel.(Rep. Rec. Pg. 52, lines 3-5)

37. All art materials change over time. (Rep. Rec. Pg. 52, lines 8-9)

38. Jacob testified that throughout the '60s, '70s to present day artists continue to use three-dimensional applications bound, like Kelley's art garden by a non-changing outside border. (Rep. Rec. Pg. 52, lines 17-21)

39. Jacob concluded it was not necessary that only Kelley make replacements to his original art form. (Rep. Rec. Pg. 52, lines 24-25, Rep. Rec. Pg. 53. lines 4-5)

40. Throughout history, artists have gone back to their original works and retouched or changed things. (Rep. Rec. Pg. 53, lines 8-11)

41. Jacob testified that Picasso was famous for changing his art. (Rep. Rec. Pg. 53,lines 11-12)

42. Jacob testified that the reason the physical changes to the art garden do not bother her is because Chapman Kelley was always involved. (Rep. Rec. Pg. 53, lines 22-25)

43. Jacob testified that Kelley purposely incorporated the vents of the Monroe Street Garage into the work of art (Rep. Rec. Pg. 59,lines 7-9,lines 16-19)

## JONATHAN DEDMON

44. Dedmon first began working on the Wildflower project in the late 1980s as member of the Chicago Wildflower Works Board. (Rep. Rec. Pg. 70, lines 19-21)

45. Dedmon has been board president since the mid-90's (Rep. Rec. Pg. 71, lines 15-20).

46. Dedmon's primary responsibility was fundraising (Rep. Rec. Pg. 72, line 6)

47. Dedmon dealt with the Chicago Park District four times regarding Kelley's art (Rep. Rec. Pg.. 72, line 22)

48. Once Kelley's art was being ruined, Dedmon wrote a letter and appeared before the park district at its regularly scheduled meeting to say that a grave injustice had been done. (Rep. Rec. Pg. 74, lines 1-4)

49.  The destruction of the art had begun before the meeting in which he raised his objections. (Rep. Rec. Pg. 74, lines 10-14)

50.  The destruction of the art had begun even before Dedmon had time to write his letter of complaint. (Rep. Rec. Pg.. 74, lines 12-14)

51.  Dedmon was never told the art garden was going to be reshaped (Rep. Rec. Pg. 74,lines 21-22)

52.  Dedmon never received written notice there were to be changes done to Kelley's art (Rep. Rec. Pg. 75, lines 6-7)

53.  There had been no public meetings to discuss the changing of Kelley's work (Rep. Rec. Pg.. 75, lines 16-17, line 21)

54.  Dedmon, Kelley and Maurine Slavin, the Wildflower Works board's secretary, met with Dr. Burroughs of the Park District at lunch in March 2004 (Rep. Rec. Pg. 75, line 25,Rep. Rec. Pg. 76, lines 1-2)

55.  Chapman Kelley raised the issue of the expired permit at the luncheon with Dr. Burroughs. (Rep. Rec. Pg. 76, lines 15-22)

56.  Dedmon concluded from Dr. Burroughs' responses that the park district had no serious issues with Kelley's art as of that March 2004 meeting. (Rep. Rec. Pg. 77, lines 2-6)

57.  The luncheon with Dr. Burroughs was "very friendly" (Rep. Rec. Pg. 77, lines 21-25).

58.  The last Park District permit for Kelley's work was issued sometime in the late '80s or early '90s. (Rep. Rec. Pg. 77, lines 9-13)

59.  Dedmon witnessed the destruction of the art work. (Rep. Rec. Pg. 78, lines 19-25, Rep. Rec. Pg. 79, line 1)

60.  During the destruction, Kelley's two large ovals were reduced to much smaller rectangles, the hedges were added, and in terms of space Dedmon estimated 35 to 40 percent of the large ovals were demolished. (Rep. Rec. Pg. 79, lines 8-18)

61.  Dedmon had visited Kelley's art garden many times previous to the dismantling. (Rep. Rec. Pg. 80, lines 9-10)

62.  Dedmon said the condition of the art,  just prior to it's dismantling, was the same as it had been over the previous 10 years. (Rep. Rec. Pg. 81, lines 13-25).

63.  The flowers were healthy just prior to their destruction. (Rep. Rec. Pg. 82, lines 3-4)

64.  Following the 1988 litigation, Dedmon never received any written complaints from Park District members regarding the art garden's condition (Rep. Rec. Pg.. 82, lines 13-21)

65.  The work of art was constantly changing. (Rep. Rec. Pg. 84, lines 21-25, Rep. Rec. Pg. 85, lines 1-8)

66.     Volunteers helped maintain the wildflowers. (Rep. Rec. Pg. 85,lines 15-17)

67.     In certain seasons of the year, volunteers groomed the art garden in different ways (Rep. Rec. Pg. 85, lines 21-25, Rep. Rec. Pg. 86. lines 1-5).

68.     The garden had to be weeded (Rep. Rec. Pg. 87, lines 3-5).

69.     Rabbits and birds and various insects lived there. (Rep. Rec. Pg. 87, lines 10-15, 19-20, 23-25)

70.     Dedmon testified that over time Chapman Kelley grew disenchanted with the Grant Park Advisory Council, noting that the Council's agenda had changed and moved away from Kelley's intentions for his art. (Rep. Rec. Pg. 89, lines 21-25, Rep. Rec. Pg. 90,lines 1-9) Dedmon testified that Kelley had a keen interest in using the Wildflower Works to teach water conservation, the right way to do wildflowers when many people had failed. (Rep. Rec. Pg, 90,lines 1-6)

71.     Dedmon remembered Dr. Burroughs referring to Kelley's conservation efforts as "the people's flowers.'" (Rep. Rec. Pg. 90, lines 4-5)

72. In 2000-2001, Dedmon and Kelley met with a West Coast design group. (Rep. Rec. Pg. 90, lines 17-21).

73. Both Dedmon and Kelley spoke at the meeting regarding their philosophy of the garden art. Rep. Rec. Pg. 90, lines 9-14)

74. Dedmon was aware of a permit for Wildflower Works dated September 14, 1988. (Rep. Rec. Pg. 94, lines 14-17).

75. That Chicago Wildflower Works did apply for a permit (Rep. Rec. Pg. 103, line 25, Rep. Rec. Pg. 104, lines 1-2)

76. However, Demon never received any correspondence from the Park District on permitting. (Rep. Rec. Pg. 105, lines 10-11)

77. Dedmon said he did not know why the Park District quit issuing permits and no one told him why. (Rep. Rec. Pg. 105, lines 22-25, Rep. Rec. Pg. 106,lines 1-2).

78. Dedmon testified that for the 8-9 previous years his board operated with the Park District's knowledge on the permits that had already been granted. (Rep. Rec. Pg. 108, lines 16-18).

79. Because there were park people in the park daily, and because Kelley had relationships with people in the field house and others in the park district, Dedmon said any complaints would have been brought to his

attention earlier than one week before the action was taken. (Rep. Rec. Pg. 108-109, lines 25, lines 1-5)

80. Defendant's Exhibit No. 8 is a letter dated February 13, 1992. The letter is directed to the Honorable Board of Commissioners of the Chicago Park District. The letter asks for an extension of the Wildflower Works permit through March 1, 1993. The letter stated that the Grant Park Management and Restoration Steering Committee would be evaluating the existence, size and location of the art based on the needs and demands for space in Grant Park. The staff would then make recommendations to the board concerning the request for a multiyear permit. (Rep. Rec. Pg. 95-96).

81. In a subsequent meeting with Mr. Randall of the Park District in June 2004, Dedmon saw Kelley become very emotional when the artist realized what the Park District was doing to his work:(Rep. Rec. Pg. 100, lines 1-14)

82. Because Kelley often used ellipses in his art, Dedmon understood the scale and the contrast of the wildflowers versus the intense urban environment. (Rep. Rec. Pg. 102, lines13-15)

# CHAPMAN KELLEY

83. Chapman Kelley is a nationally known artist. (Rep. Rec. Pg.112, lines 9-17; final pre-trial order, agreed stipulation, nos. 4, 5, 6, 7; Plaintiff's Exhibits 1, 2, 3, 5, 10).

84. Kelley joined with Lady Bird Johnson, the Rockefellers, Bonnie and John Swearingen and others in 1982 to use wildflowers in an artistic way that could also have environmental benefits. (p. 113, lines 8-17)

85. Kelley moved from Texas to Chicago in the 1983-84 timeframe after the park district offered him a permanent exhibition of Wildflower Works in Grant Park. (Rep. Rec. Pg.114, lines 4-5)

86. Kelley won approval to create his Wildflower Works of art by showing the Park District what he had previously done with wildflowers over four and one-half acres at Dallas' historic Fair Park and along a four-mile strip of median at DFW Airport. (Rep. Rec. Pg. 114, lines 19-21; final pre-trial order, agreed stipulation, no. 10, 11, 12).

87. Kelley's first Chicago permit was granted in 1984 (Rep. Rec. Pg. 115, line 21; final pre-trial order, agreed stipulation, no. 12; Plaintiff's Exhibit 12).

88.     The first permit was for a permanent wildflower display. (Rep. Rec. Pg. 116, line 15; final pre-trial order, agreed stipulation, no. 14).

89.     The first permit included Kelley's responsibilities. (Rep. Rec. Pg. 117, lines 7-9)

90.     Among the conditions was that Kelley would have to pay for his creation. (Rep. Rec. Pg. 117, lines 10-11; final pre-trial order, agreed stipulation, nos. 13, 20)

91.     Kelley paid for his art creation (Rep. Rec. Pg. 117, lines 12-13)

92.     The Park Board was allowed to review and approve of the work. (Rep. Rec. Pg. 117, lines 14-24)  But the Board was not allowed to remove or reconfigure Wildflower Works without giving Kelley notice. (Rep. Rec. Pg. 118, lines 17-19)

93.     Kelley received a 90-day written notice to remove Wildflower Works in 1988. (Rep. Rec. Pg. 118, line 21)

94.     Based on that letter, Kelley instituted a lawsuit. (Rep. Rec. Pg. 119, line 7)

95.     Unlike in 1988, Kelley never received a written notice in 2004 when his art was violated, though he was expecting one. (Rep. Rec. Pg. 119, lines 14-15)

96.     Kelley did not receive yearly permits (Rep. Rec. Pg. 119, lines 18-19)

97. Kelley said the reason he did not expect yearly permits is that he knew the art garden was a permanent display. (Rep. Rec. Pg. 119, line 21)

98. After receiving the 90-day notice prompting his original lawsuit in 1988, Kelley was given a temporary permit that ran 1988-89, then another one or two more until '94. (Rep. Rec. Pg. 120, lines 5-11).

99. Kelley received a final permit extension in 1992 to run until '94. (Rep. Rec. Pg. 121, lines 6-7; pre-trial order, agreed stipulation, nos. 37, 38, 39, 41)

100. Kelley continued to work on the garden art eight months out of every year (Rep. Rec. Pg. 121, lines 14-15)

101. Kelley intentionally incorporated the garage's air ducts into the art (Rep. Rec. Pg. 123, lines 7-10)

102. Kelley's personal trademark as an artist is the elliptical shape of the two ovals. (Rep. Rec. Pg. 123, lines 19-20)

103. During the 10-year stint he went without a permit, Kelley received only one complaint of any kind (Rep. Rec. Pg. 124, line 11). No written complaints were ever received by Kelley from anyone in any capacity with the Chicago Park District (Rep. Rec. Pg. 123, lines 13-14)

104. Kelley and 12 to 50 non-paid volunteers helped with the wildflower project (Rep. Rec. Pg. 125, lines 15-16, Rep. Rec. Pg. 126, lines 7-8; final pre-trial order, agreed stipulation, nos. 18, 19).

105. None of the volunteers was paid (Rep. Rec. Pg. 126, lines 7-8).

106. For two early years, Kelley had a program with the School of the Art Institute wherein the Wildflower Works Board paid the students half and the school paid half. (Rep. Rec. Pg. 126, lines 9-11)

107. At another time period, Kelley said two employees were hired, but he went back to the volunteers because they did a better job of upkeep on the art garden. (Rep. Rec. Pg. 126, lines 17-19)

108. Kelley often changed the species of plants depending on maintenance and how they blended in. (Rep. Rec. Pg. 127, lines 17-19)  The Park District never registered a complaint to Kelley or prevented his use of any species of plant. (Rep. Rec. Pg. 128, lines 13-16)

109. The plants began growing in five greenhouses, and then were planted by Kelley's design. (Rep. Rec. Pg. 129, lines 6-8)

110. Kelley purchased all of the plugs, an estimated 380,000. (Rep. Rec. Pg. 129, lines 15-19)

111. The 380,000 plugs were purchased at 40 cents apiece (Rep. Rec. Pg. 129, line 21).

112. Kelley also paid a company to do the original installation. (Rep. Rec. Pg. 129, line 22). Kelley paid for all costs. (Rep. Rec. Pg. 131, line 1)

113. The Chicago Park District prepared the land at Kelley's direction and incurred only those minor costs. (Rep. Rec. Pg. 131, lines 8-14)

114. Flattering articles were written about the project by the New York Times and Christian Science Monitor in 1985. (Rep. Rec. Pg. 132, lines 1-23)

115. Similar articles were published all over the world. (Rep. Rec. Pg. 133, line 1)

116. The Illinois Senate passed a 1985 resolution commending the work. (Rep. Rec. Pg. 132; Rep. Rec. Pg. 133, lines 1-5; final pre-trial order, agreed stipulation, no. 28; Plaintiff's Exhibit 4).

117. Kelley received a letter of commendation from the Illinois Chapter of the American Society of Landscape Architects. (Rep. Rec. Pg. 134, lines 13-14)

118. In 2000, the Chicago Park District paid to improve the art's metal edging after the weather had caused it to frost heave. (Rep. Rec. Pg. 136, lines 2-6)

119. The water was turned off and was not used for Wildflower Works. It was also turned off to prevent a wetland area from forming and to avoid water waste. (Rep. Rec. Pg. 136, lines 6-11)

120. The Park District brought artists from the U.S. and Canada to Chicago to create works of art using flowers, in 2000. (Rep. Rec. Pg. 137, lines 12-14). The project's name was Art in the Garden and was paid for and promoted by the Chicago Park District. (Rep. Rec. Pg. 137, lines 9-15)

121. Plaintiff's Exhibit No. 29 is a service mark of the term Wildflower Works (Rep. Rec. Pg. 138, line 13). Kelley wished to show that his garden was unique and original art and had it designated as a new concept. (Rep. Rec. Pg. 138-139, lines 11-25, lines 1-18)

122. Kelley perceived Wildflower Works to be both painting and sculpture.(Rep. Rec. Pg. 140-141, lines 7-25, line 1)

123. VARA did not exist when Kelley created the works. (Rep. Rec. Pg. 142, line 25)

124. VARA did not exist when Kelley initiated his first lawsuit against the Park District in 1988. (Rep. Rec. Pg. 143, lines 3-5)

125. Less than 10 percent of the planted flowers died. (Rep. Rec. Pg. 203-204, lines 25, 1)

126. Kelley arranged the flowers in purposeful patterns of art (Rep. Rec. Pg. 205, lines 3-12) and designed them to fit his artistic desires. (Rep. Rec. Pg. 208, lines 1-6)

127. Kelley paid 40 cents per plug for 380,000 plugs, his initial costs at 20-year-old prices that did not include the cost of installation, plus steel and gravel (Rep. Rec. Pg. 205-206, lines 16-25, line 1)

128. In 2003 alone, Kelley bought roughly 37 pounds of seeds. (Rep. Rec. Pg. 207, lines 1-3)

129. Kelley received an official written notice in 1988 when the Park District intended to alter his work but received nothing in 2004. (Rep. Rec. Pg. 208, lines 10-12, line 17)

130. Kelley suffered irreparable damage to his reputation as an artist after his art garden was destroyed (Rep. Rec. Pg. 210, lines 3-7) because, Kelley testified, the removal or destruction of any artist's masterpiece will diminish the artist's stature even beyond his life. (Rep. Rec. Pg. 210, lines 1-7)

131. Kelley did not receive notice in 1994 that the permit would be terminated in 90 days. Kelley never received Plaintiff's Exhibit 20. (Rep. Rec. Pg. 214, line 10)

132. Instead of Wildflower Works being exclusive of the traditional definitions of paintings and sculptures, Kelley regarded the art garden as inclusive of these other terms. (Rep. Rec. Pg. 215, lines 19-20)

133. The Park District called his garden "a living art" from the beginning. (Rep. Rec. Pg. 224, lines 14-19)

134. Most works of art, particularly those outdoors, require maintenance. (Rep. Rec. Pg. 225, lines 13-15) Despite the changing seasons, the work itself remained a complete work of art. (Rep. Rec. Pg. 226, lines 1-9)

135. Although Kelley received another temporary permit September 14, 1988 (Defendant's Exhibit 6) Kelley felt he and the Park District were still bound by the original permit allowing for a permanent display. (Rep. Rec. Pg. 229, lines 23-25

136. Kelley never had the opportunity to remove any of his material because he was never given official written notice in 2004 that the art was about to be violated. (Rep. Rec. Pg. 231, lines 15-17)

137. The last temporary permit ended in 1994. (Rep. Rec. Pg. 233, lines 9-11)

138. After the 1994 permit, Kelley and his board proceeded as they always had because every response from board members and staff remained positive and encouraging. (Rep. Rec. Pg. 234, lines 7-8)

139. Kelley and his group often asked about their status and were always reassured. (Rep. Rec. Pg. 233-234, lines 18-25, lines 1-12)

140. Based on the initial, permanent permit and under the protection of the Visualized Artists Rights Act, Kelley assumed he had nothing to worry about. (Rep. Rec. Pg. 234, lines 9-12)

141. Kelley participated in the Grant Park Advisory Council for "about ten years" but he and other longer-term members stopped in 1988 because the council had changed its tone and direction, no longer representing the neighborhood. (Rep. Rec. Pg. 239, lines 9-15)

142. Kelley said the art garden was portable because it could be transported, just as sections of grass are up lifted and moved. (Rep. Rec. Pg. 242, lines 20-24) The plants could have been moved very cheaply. (Rep. Rec. Pg. 256, lines 2-4)

143. Kelley did not feel slighted by the way the Park District treated his masterpiece because the board heralded it as a work of art until June 2004. (Rep. Rec. Pg. 245-246, lines 23-25, lines 1-5)

144. The art garden was not exclusive only to a Grant Park setting. (Rep. Rec. Pg. 249, lines 9-15)

145. Kelley concluded that Grant Park would best help express his vision and bring the best audience (Rep. Rec. Pg. 250, lines 23-25)

146. Kelley's original vision included the contrast between the plants and the urban area. (Rep. Rec. Pg. 251, lines 4-8)

147. The Park District admitted Kelley owned the plants. But Kelley chose not to claim the plants following the destruction because their removal would have been pointless and mean-spirited. (Rep. Rec. Pg. 255-256, lines 20-25)

148. Kelley testified his Wildflowers art is not site specific. (Rep. Rec. Pg. 383, lines 1-2). He said the Works was portable because it could be moved. (Rep. Rec. Pg. 383-384, lines 19-25, lines 1-2)

## RANDALL ISMAY

149. Ismay is a horticultural consultant. (Rep. Rec. Pg. 165, line 16)

150. Ismay was employed as an expert to testify in the case. (Rep. Rec. Pg. 166, line 16)

151. Ismay was aware that Kelley would be creating Wildflower Works even before Kelley began planting. (Rep. Rec. Pg. 172, lines 1-3)

152. Before the art was destroyed, Ismay estimated that in the year 2003 the garden included millions of plant materials, based on the density of plant materials that were growing in the two ellipses." (Rep. Rec. Pg. 173, lines 3-5).

153. Ismay said approximately 66,000 square feet of area was planted between the two ellipses. (Rep. Rec. Pg. 173, lines 9-10)

154. Maintenance was required specifically because it was a work of art: "As wildflowers technically they would not need to be maintained. As an art piece, as it was, it would demand a high level of maintenance periodically throughout the year." (Rep. Rec. Pg. 174, lines 6-10)

155. Kelley intended for the art to change in appearance. (Rep. Rec. Pg. 175, line 4)

156. Ismay said it would cost $3 to $5 million to replace the plants that Kelley had constructed prior to the art's ruination. (Rep. Rec. Pg. 175, lines 20-25).

157. Ismay based his conclusion on an estimate of 10 plants per square foot at 66,000 square feet for both ovals. (Rep. Rec. Pg. 176, lines 6-14)

158. Ismay concluded that the 660,000 plants would have an average value from 25 cents to $100 per plant with a conservative estimate of $2.50

to $3.00 per plant, or $1.5 million total at $2.50. (Rep. Rec. Pg. 176-177, lines 11-25, lines 1-11)

159. Ismay's estimate did not include the monetary value he places on the Wildflower Works' artistic and scientific worth:

160. Ismay said that scientifically: the density of the plant materials had reached an incredibly high count -- more plants per square inch in terms of forbs, than he had seen in any other location in the world. (Rep. Rec. Pg. 179, lines 9-17)

161. Ismay estimated conservatively it would cost $150,000 to $200,000 per year to contract with a university or some outside company for the continued upkeep of the garden art (Rep. Rec. Pg. 180, lines 3-6)

162. Ismay estimated four to five years of scientific research has been lost by the destruction of the wildflowers, placing the scientific worth at $1 million.(Rep. Rec. Pg. 180, lines 16-17)

163. Ismay was asked only to give the value of the plant material just prior to the art piece's destruction. (Rep. Rec. Pg. 191, lines 18-22)_Ismay did research in the Chicago area for the cost of plants (Rep. Rec. Pg. 19, lines 23-25)

164. Regarding maintenance costs, Ismay testified it is a very intensive significant part of the overall value that the plant materials accrue over time. (Rep. Rec. Pg. 194, lines 9-13)

165. Ismay was able to estimate the value of the plants without knowing what each plant was in detail because of his knowledge of plant species, sizes, etc. (Rep. Rec. Pg. 195, lines 8-15)

166. Ismay did not factor the reproduction of plants into his cost estimates, placing value only on those plants alive and growing. (Rep. Rec. Pg. 195-196, lines 23-25, lines 1-2)

## GUS TRUJILLO

167. Trujillo lived across the street from the Wildflower Works in 1988. (Rep. Rec. Pg. 259. lines 4-6)

168. Trujillo was a volunteer for Wildflower Works. (Rep. Rec. Pg. 250, lines 9-10)

169. Trujillo witnessed the destruction of the art on his way to work one morning. (Rep. Rec. Pg. 261, lines 2-6)

170. Trujillo said trucks with eight to 10 men started tearing out the flowers and throwing them away. (Rep. Rec. Pg. 261, lines 6-7)

171. Trujillo saw numerous quality flowers being discarded. (Rep. Rec. Pg. 261, lines 13-15)

172. On his way to work over the years and while volunteering, Trujillo saw many rabbits, insects and several migrations of birds (Rep. Rec. Pg. 263, lines 5-6).

173. As a volunteer, Trujillo knew he was contributing to a work of art as an art restorer would, working under Kelley's direction. (Rep. Rec. Pg. 266, lines 13-21)

174. Trujillo spent 8-9 hours every weekend on the project in the spring (Rep. Rec. Pg. 267, lines 23-25)

**MAURINE SLAVIN**

175. Miss Slavin began with Wildflower Works, Inc., as a volunteer and later became secretary. (Rep. Rec. Pg. 272, lines 8-13)

176. Miss Slavin attended the Pearl Restaurant luncheon with Dr. Burroughs that included Kelley and Dedmon. (Rep. Rec. Pg. 275, lines 21-23)

177. Dedmon specifically asked Burroughs at the luncheon about the expired permit because the matter had come up before Wildflower Works board members, and they knew clarity was important. (Rep. Rec. Pg. 276, lines 6-11)

178. Miss Slavin asked Dr. Burroughs: "Do we need to be filing a permit – do we need to file a permit?" (Rep. Rec. Pg. 276, lines 13-14)

179. Miss Slavin testified that Dr. Burroughs' answer was, "You're still here, aren't you? That's all you need to do." (Rep. Rec. Pg. 276, lines 19-20)

180. There was no doubt in Miss Slavin's mind that Dr. Burroughs represented the Chicago Park District in their many dealings and discussions. (Rep. Rec. Pg. 282, lines 11-25)

## ARNOLD RANDALL

181. Mr. Randall is commissioner of Planning and Development for the City of Chicago. He had two stints with the Chicago Park District (May 1999 to summer 2001; spring 2004 to spring 2007)

182. Randall was area manager of the Park District from May '97 to May or June '98. (Rep. Rec. Pg. 288, lines 17-20)

183. As area manager, Randall became aware of concerns regarding the maintenance of Kelley's project (Rep. Rec. Pg. 289, lines 10-11)

184. Randall returned to the Park District in 2004 as director of Development and Planning for the Park District. (Rep. Rec. Pg. 291, lines 9-10)

185. Randall decided changes needed to be made to the Wildflower Works (Rep. Rec. Pg. 292-293, lines 25, lines 1-3)

186. It was Randall who decided the Wildflower Works' configuration and maintenance were inappropriate for the changes that were going to happen with Millennium Park. (Rep. Rec. Pg. 293, lines 23-25)

187. Randall felt the Wildflower Work's configuration did not allow for a clear traffic flow. (Rep. Rec. Pg. 294, lines 11-15) Kelley testified the traffic flow was so substantial that on the 3rd of July of every year, "we had a million people down there surrounding the Wildflower Works." (Rep. Rec. Pgs. 254-255, lines 25, line1)

188. Randall could not recall ever receiving any written communication from the Grant Park Advisory Council regarding the Wildflower Works' maintenance. (Rep. Rec. Pg. 294-295, lines 22-25, lines 1-4)

189. Randall did not know that the original permit was permanent (Rep. Rec. Pg. 297-298, line 25, lines 1-4)

190. Randall phoned Kelley and invited him to a meeting to discuss changes to Wildflower Works. (Rep. Rec. Pg. 299-300, line 25, line 1-2)

191. The meeting was at the field house at Daley Bicentennial Plaza (Rep. Rec. Pg. 299, line 15) and included Randall, Kelley, Dedmon of Wildflower Works, Chris Gent of the Park District's planning

department, and Cheryl McMahon, Director of Natural Resources. (Rep. Rec. Pg. 299, lines 18-21)

192.   At that meeting, Chapman Kelley was presented with the proposed plans that would alter his art, including the design. (Rep. Rec. Pg. 301, line 1)

193.   At that same June 2004 meeting Kelley expressed his belief that Wildflower Works was a work of art, not merely a garden, and no one had the right to change it without his consent. (Rep. Rec. Pg. 302, lines 12-18)

194.   Randall told Kelley his project was a garden space like all the other garden spaces within the Park District. (Rep. Rec. Pg. 302, lines 22-23)  But Kelley testified that at the same meeting Shirl McMayon said, "We move gardens around all the time." Kelley responded, "This is recognized not as a garden or as a usual garden."  Then she just insisted, you know: We can move this around like we move everything else around." (Rep. Rec. Pgs. 252-253, lines 18-25, lines 1-3)

195.   Randall sited problems with the Monroe Street Garage, including leakage and water damages (Rep. Rec. Pg. 304, lines 14-17).

196. To make improvements to the Monroe Street Garage, Randall said it would require a demolition of Daley Bicentennial Plaza, including the uprooting of all trees and grass and flowers. Then a new park space was to be created on top once the garage was rebuilt. (Rep. Rec. Pg. 304-305, lines 24-25, lines 1-3)

197. Randall has never had any supervisory authority regarding the landscape maintenance of the Wildflower Works.(Rep. Rec. Pg. 305-306, line 25, lines 1-4)

198. At the aforementioned meeting, Kelley was informed by Randall that his input was invited but they were going through with the altercations. (Rep. Rec. Pg. 307, lines 2-5).

199. When Kelley said it would not be appropriate for them to make changes without his consent, Randall said he told Kelley that the Park District did have that right. (Rep. Rec. Pg. 307, lines 16-17)

200. The decision to destroy Kelley's art was a joint one, Randall said, between himself, the general superintendent, the director of Natural Resources and the Mayor's Landscape Task Force. (Rep. Rec. Pg. 308, lines 9-13)

201. Three people ultimately made the decision to alter the Wildflower Works. (Rep. Rec. Pg. 308, lines 15-16)

202. There was no vote. (Rep. Rec. Pg. 308, line 18)

203. No decision to alter the Wildflower Works was made in writing. (Rep. Rec. Pg. 309, lines 13-15)

204. No notes were taken of the meeting when the decision was made to destroy the art. (Rep. Rec. Pg. 309, lines 16-17)

205. Randall believed that the Park District, and not Kelley, owned the plants. (Rep. Rec. Pg. 311, lines 9-12).

206. When the Court pointed out to Randall that the original permit and a 1988 agreement stated Kelley's ownership of the plants, Randall thought that the Park District owned the plants once the permit expired. When the Court asked Randall if he sought legal advice on this matter, Randall said no. (Rep. Rec. Pg. 312, lines 7-8)

207. Randall testified that not even the superintendent of the Parks responded in writing regarding the entire process of violating Kelley's Work. (Rep. Rec. Pg. 318, lines 5-12)

## Dr. MARGARET BURROUGHS

208. Dr. Burroughs is the senior member of the Park District board. (Rep. Rec. Pg. 322, lines 10-11)

209. Dr. Burroughs did not remember if Chapman Kelley ever asked for a permit extension for Wildflower Works. (Rep. Rec. Pg. 326, lines 17-19)

210. Dr. Burroughs was not aware that the Wildflower Works had been destroyed by the actions of the Chicago Park District (Rep. Rec. Pg. 328, lines 3-6)

211. Dr. Burroughs was not aware that the configuration of Kelley's art garden had been dramatically changed, (Rep. Rec. Pg. 328, lines 7-11)

212. Commissioner Burroughs has an office at Park District headquarters. (Rep. Rec. Pg. 332, lines 12-14)

## CHRISTOPHER GENT

213. Mr. Gent is deputy director of planning and development for the Park District (Rep. Rec. Pg. 3, lines 23-24).

214. Gent was involved in the Grant Park framework plan – the overview plan for the entire park and its parts, dealing with the community to study how parks can be improved. He does not deal with financial issues but rather long-term planning. (Rep. Rec. Pg. 337, lines 8-19)

215. The Grant Park framework plan was completed in January 2002 and included recommendations to Daley Bicentennial Plaza. (Rep. Rec. Pg. 338-339, lines 23-25, lines 1-4)

216.  In 2002, as project manager of the Grant Park garden overlay, Gent helped hire a design firm from Seattle to study the park and make recommendations for improvements. (Rep. Rec. Pg. 341, lines 2-11)

217.  No input was sought from the public regarding the study. All input came from Gent and Bob McGeir, Director of Planning and Development. (Rep. Rec. Pg. 341-342, lines 23-25, lines 1-2)

218.  Gent worked with the consultant to redesign Kelley's art. (Rep. Rec. Pg. 350-351, lines 24-25, lines 1-2)

219.  Gent helped reconstruct the ovals, stretching them out to look more rectilinear, thus violating Chapman Kelley's elliptical trademark. (Rep. Rec. Pg. 352, lines 1-15)

220.  The reconstruction of Kelley's art included an evergreen hedge as its boundary. (Rep. Rec. Pg. 352, line 17)

221.  The size of Wildflower Works was reduced from 66,000 square feet to less than 30,000 square feet.(Rep. Rec. Pg. 352, lines 21-22)

222.  An attempt was made to replant the native plant material. (Rep. Rec. Pg. 353, lines 15-16)

223.  Shade trees were added to Wildflower Works during construction. (Rep. Rec. Pg. 356, lines 7-23)

224. Gent opined that Wildflower Works was reconfigured. (Rep. Rec. Pg. 358, lines 18-21)

225. The City of Chicago Park District changed the size and shape of the art. (Rep. Rec. Pg. 358, lines 22-23)

226. Kelley was shown the plans for the revisions in a meeting with Dedmon, Randall, McMahon and Gent at the Daley Bicentennial Plaza. (Rep. Rec. Pg. 363, lines 18-23)

227. Gent said Kelley and his Wildflower Works people were surprised at the meeting and unaware of the changes (Rep. Rec. Pg. 364-365, lines 21-25, lines 1-2)

228. Gent faxed copies of the plan to Kelley and Dedmon. (Rep. Rec. Pg. 365, lines 21-22)

229. The Park District has signed a 99-year lease with a private company to manage all of the Grant Park garages. (Rep. Rec. Pg. 366, lines 7-11)

230. Plans are to rehab the east Monroe garage, remove most or the entire roof, and put in a new landscape. (Rep. Rec. Pg. 366, lines 12-16)

231. Roof reparations will continue until 2011. (Rep. Rec. Pg. 367, lines 13-16)

232. Gent received complaints about the condition of the Wildflower Works but kept no notes and had no written evidence. (Rep. Rec. Pg. 369, lines 20-24)

233. Although the framework plan is a public document (Rep. Rec. Pg. 370, lines 10-14), the overlap plan was an internal document. (Rep. Rec. Pg. 370, line 17), and it was never approved by the Park District Board. (Rep. Rec. Pg. 370, lines 22-25)

234. Representatives of the art garden were not contacted about the overlay project. (Rep. Rec. Pg. 371, lines 15-16)

235. In regards to meetings with the Mayor's Landscape Committee and the Grant Park Advisory Council, no notices were sent to Kelley because Gent said it's not his responsibility to send out invitations. (Rep. Rec. Pg. 374, lines 7-14)

236. Gent was asked by Arnold Randall to work with the Chicago Park District's consultant on the design and that's all he knew (Rep. Rec. Pg. 375, lines 16-17)

237. No plants were removed from the Wildflower Works and redistributed in other parks. (Rep. Rec. Pg. 375, lines 23-24)

238. Some flowers were replaced back into Kelley's art. (Rep. Rec. Pg. 375-376, line 25, lines 1-2)

## SITE PLAN: DALEY BICENTENNIAL PLAZA

239. Less than 10 percent of the wildflowers from the original planting still existed following the destruction, making it impossible for 90 percent of the plants to have been transplanted into existing beds, as the Park District has maintained.

As relates to "Site Plan: Daley Bicentennial Plaza" utilized by the Park District to explain the amount of reconsideration done to Wildflower Works, the site plan itself provides the following:

The map's scale (1" equals 50') is no longer operative but can be configured correctly by comparing the 50-foot dimension with the known dimensions of the garage vents (28' by 30') and the ellipsis (150' by 310'). The two rectangles between the vents are approximately 28' by 80' (allowing for 5 feet each for hedges and spaces); that total equaling 2,240 square feet (the sum of 28 x 80) for each rectangle, plus a border of wildflower beds around the vent between the footpaths of at best 1,088 square feet.

Therefore, 2 rectangles of 2,240 sq. ft. = 4,480 sq. ft.

1 eight-ft. border around 28 x 30 vent = 1,088 sq. ft.

Total = 5,568 sq. ft. of wildflowers

The planted area of both ellipsis = 66,000 sq. ft., leaving only 8.436 percent of the wildflowers there prior to the destruction. (See Pg. 37A diagram)

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### LIABILITY

`1.    The Chicago Park District is a created public agency organized and existing under the laws of Illinois for the purposes of controlling and supervising the operations of all parks, boulevards and public ways under its jurisdiction.  Its place of business is in Cook County, Illinois. (Final Pre-trial Order, Agreed Stipulations, No. 2)

2.    Grant Park in Chicago, Illinois is public land, codified 70 ILCS 1580, 70 ILCS 1585 and 70 ILCS 1590, and is under the supervision of the Chicago Park District.   (Final Pre-trial Order, Agreed Stipulations, No. 3)

3.    Wildflower Works constituted a "work of art" under VARA.  To the Plaintiff it was a work of art.  The Plaintiff is a recognized artist. The work of art constituted a painting using plants, gravel and steel as a medium. (Rep. Rec. Pg. 388)

4.     The Agreement between the Plaintiff and the Chicago Park District was that the Plaintiff would at his expense plant and maintain the Wildflower Works. In turn the Park District would allow the display on the particular site. The Agreement was subject to the right of the Park District to give Plaintiff 90 days' notice to quit. In that event Plaintiff would have the right to remove the plants if he wanted to. Plaintiff always had the right to be able to remove the plants, if he wanted to do so. The Park District had a right to dispense with the Wildflower Works whenever it wanted to. It didn't need a reason. Plaintiff had a right to 90 days' notice under the Agreement. VARA contemplates 90 days as being a reasonable time and the Court finds that 90 days is a reasonable time period. Plaintiff was not given any notice that the Park District was going to destroy the Wildflower Works. (Rep. Rec. Pg. 389)

5.     The Park District did not have the right to change the Wildflower Works without Plaintiff's permission. The Park District could not make alterations to the Wildflower Works without Plaintiff's permission. (Rep. Rec. Pg. 390)

## DAMAGES

6.     The value of the plants owned by the Plaintiff immediately prior to their destruction by the Park District was $1.5 million dollars, as established by Randall Ismay. (Rep. Rec. Pg. 390-391)

7,     The Plaintiff's Wildflower Works is copyrightable under the Copyright Act because the arrangement, coordination or selection displayed by the Plaintiff is copyrightable. *Harper Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 851 LK. Ed. 2d 588, 105 S. Ct. 2218 (1985); *Schroeder v, William Marrow & Co*., 566F.2d 3 (7th Cir. 1977)(Individual original compilation of information is copyrightable even though the original information is in the public domain and is not copyrightable because it contains originality. Id. at 5.) ; *Illinois Bell Telephone Company v. Hanes and Co*., 905 F.2d 1081 (7th Cir. 1990).

8.     A copyright infringer is liable for either the copyright owner's actual damages and any additional profits of the infringer, or statutory damages as provided for in section 17 U.S.C. § 504. At any time before final judgment, the copyright owner may elect statutory damages instead of actual damages in the sum of not less than $250 or more than $10,000 for each infringement, as the

court considers just. 17 U.S.C. §504(e)(1976); *Illinois Bell*, 905 F,2d 1081 at [47]. The Plaintiff has advised the court that he has elected a statutory damages award in this case. [*See:* Notice of Election of Statutory Damages filed by the Plaintiff with the court of even date.]

9.     An award between the minimum and the maximum statutory limits for copyright infringement damages is wholly within the trial court's discretion and sense of justice. *Markham v. A .E. Borden, Co*., 221 F.2d 586 (1st Cir. 1955)(Judge determined an award was justified to penalize the infringer for its illbegotten profit and to deter future violations. Such considerations are wholly proper for a district court in granting copyright damages. *International Korwin Corp. v. Kowalezyk,* 885 F.2d 375, 383 (7th Cir. 1988). A damage award greater than profits is also proper to put potential infringers on notice that "it costs less to obey the copyright laws than to violate them." Id. at 383.

10.     The Copyright Act provides that statutory damages will be determined by the court upon the number of infringements done by the infringer at the rate of a range from a minimum of $250.00 to $10,000.00 per infringement. The court can decide how many infringements occurred to the work of art. Testimony established that there were

approximately 1,000,000 live plants in the Wildflower Works at the time of the destruction of the Wildflower Works. Applying the minimum statutory value to each infringement and considering the work of art as a whole, the value of the infringement is $250,000,000.00. Applying the maximum statutory value, the value of the infringements is $10,000,000.00. Both of these values appear to be excessive for the Wildflower Works. However, if Dedmond's estimate that the Park District destroyed approximately 35% of the Wildflower Works is utilized, even though such destruction essentially was a complete destruction of the work of art, then the number of infringements is approximately 350,000, considering each destruction of each plant as one infringement. Trujillo testified that 2 trucks and 8-10 men worked three days hauling off destroyed plants; therefore, an estimate of three trips per truck per day is reasonable or a total of eighteen trips to destroy plants over the three days occurred, disposing about 20,000 plants per trip. The Court concludes that there were 20,00 infringements by the Park District at a value of $1,250.00 each -- that is, $1,000.00 per infringement for the damages and $250.00 as punishment so that the Park District and others will realize that it is cheaper to obey the Copyright Law than violate the law, and

concludes that the Plaintiff is entitled to damages of $25,000,000.00, plus prejudgment interest at the legal rate since the Court finds that the violations by the Park District were willful violations. *Gorenstein Enterprises, Inc. v. Quality Care U.S.A., Inc.*, 874 F.2d 431 (7th Cir. 1989)(Prejudgment interest is presumptively available to victims of federal law violations.); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557 (7th Cir. 2003).

## ATTORNEY FEES

11.   Section 505 of the Copyright Act provides that "in its discretion" a district court may "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. §505. The Court has considered in awarding attorney fee such non-exclusive factors as frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence. *Harris Custom Builders, Inc. v. Hoffmeyer*, 140 F.3d 728, 730 (7th Cir. 1998)(quoting *Fogerty v. Fantasy, Inc.* 510 U.S. 517, 534 n. 19 (1994). In addition the court has considered the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc*., 448 F.2d 714 (5th

Cir. 1974). The court awards as a reasonable attorney fee for Plaintiff's attorney in this case the sum of $250,000.00.

## COSTS

All costs incurred by Plaintiff in this case are awarded to Plaintiff.

Respectfully submitted,

/s/ Frank P, Hernandez _____
Frank P. Hernandez
716 Wayne
Dallas, TX 75223-1645
214-821-1213
Fax 214-821-1214
E-mail: fgeagle@aol.com
TBC# 09516000
Attorney For Plaintiff

## CERTIFICATE OF SERVICE

I certify that a copy of this pleading, Plaintiff's Proposed Findings of Fact and Conclusions of Law, was provided by electronic filing and regular mail on the 31st day of December, 2007.

/s/ Frank P, Hernandez _____
Frank P. Hernandez