# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHAPMAN KELLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.  04 C 07715 |
| v. | ) |
| | ) |
| CHICAGO PARK DISTRICT, | )   HONORABLE DAVID H. COAR |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chapman Kelley ("Kelley") brought this action against Defendant Chicago Park District ("Park District"), alleging in Counts I and II of the Complaint that the Park District violated the Visual Artists Rights Act, 17 U.S.C. § 106A, when it removed his wildflower plantings that were existing as an exhibit in Grant Park in Chicago, Illinois.  He seeks damages to his reputation and integrity as well as statutory damages and attorneys' fees for the allegedly willfully destructive acts of the Park District pursuant to Section 504 of the United States Copyright Act.  In Count IV of the complaint,[1] Kelley alleges breach of a contract existing between him and the Park District and he seeks the fair market value of materials removed from the Wildflower Works display.  The instant matter proceeded to bench trial on September 24, 2007.  At the close of trial, both parties submitted post-trial memoranda.  Based on the trial and parties' pre-trial and post-trial submissions, the Court makes the following findings of fact and conclusions of law.  To the extent that any findings may be deemed conclusions of law, they

---

[1] Count III was dismissed in a separate order of this Court.

-1-

shall also be considered conclusions. To the extent that any conclusions may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

1.  **FINDINGS OF FACT[2]**

    a.  **The parties**

    Plaintiff Chapman Kelley is an artist by training and by trade. He has painted on various media and his work is represented in public and private collections in at least eighteen states and three foreign countries. Compl. ¶ 5-6.

    Defendant Park District is a duly created public agency organized and existing under the laws of the State of Illinois for the purpose of controlling and supervising the operations of all parks, boulevards, and public ways under its jurisdiction. Final Pretrial Order Agreed Stipulations ("FPTO Stip.") ¶ 2.

    b.  **Wildflower Works**

    In March 1984, the Park District granted a permit to Kelley to create an exhibit called "Wildflower Works I" ("Wildflower Works") in Chicago's Grant Park. The permit was granted subject to several provisions, including one that gave the Park District the option of terminating the installation with adequate notice:

    > This installation is subject to a 90 day notice to remove the planting upon written notice from the General Superintendent.

---

[2] Made pursuant to Federal Rule of Civil Procedure 52(a).

Pl.'s Ex. 12. Under the terms of the permit, Kelley was to install and maintain Wildflower Works at his expense in exchange for the Park District's allowance for the exhibit on its property. *Id*. Kelley initially financed the project himself and purchased between 200,000 and 380,000 wildflower plugs at a cost of between $80,000 and $152,000.[3]

In June 1984, Kelley began installing Wildflower Works in an area of Grant Park designated as the Daley Bicentennial Plaza, which is the roof of the East Monroe Street Parking Garage. Grant Park is public land, codified at 70 ILCS 1580, 1585, 1590, and is under the supervision of the Park District. The location is bordered by Monroe and Randolph Streets to the north and south, and Columbus and North Lake Shore Drives to the west and east, and is near the heart of Chicago's central business district. The exhibit consisted of two elliptical shapes, formed by gravel and metal edging, that enclosed two beds of wildflowers, laid out in accordance to Kelley's design. Its approximate size was 1.5 acres, or 66,000 square feet. FPTO Stip. ¶ 17. Kelley planted the wildflower seeds and plugs, cultivated and pruned the plants, and organized volunteers to maintain the gardens. Kelley did maintenance work on the exhibit eight months a year for each of the twenty years it was installed.

After its completion, Wildflower Works attracted the attention of national news outlets, including the *New York Times* and the *Christian Science Monitor*, which published articles that commented positively on the exhibit. *Wildflowers as Art For a Chicago Park*, N.Y. Times, June 20, 1985, at 21; Lucia Mouat, *Artist Finds His Wildflowers Are Growing On Chicago*, Christian Science Monitor, June 6, 1985, at 1. Kelley was also commended by various state and local

---

[3] Although Kelley's complaint lists the higher figure as only $120,000, this Court arrives at the $152,000 figure based on Kelley's testimony that he purchased 380,000 wildflower plugs at approximately $.40 apiece. Compl. ¶ 16; Trial Tr. vol. 1, 129, Sept. 24, 2007.

officials for the installation. In a letter inviting the press to a preview of Wildflower Works in 1984, Chicago Park District General Superintendent Edmund L. Kelly lauded Kelley as "an internationally renowned artist . . . a pioneer in the use of natural materials for 'living' art [who] has achieved national prominence for his efforts to incorporate landscape in artistic creation." The Illinois Senate recognized Wildflower Works as "a new form of living art . . . [in] the first park district in the United States to display a live wildflower work of art of this scale" and commended Kelley for "his vast artistic contribution to Grant Park." Pl.'s Ex. 4, Illinois Senate Resolution No. 420 (June 29, 1985).

### c. Expiration of the temporary permit

In 1988, the Park District notified Kelley that his permit for Wildflower Works was to be terminated within ninety days. Pl.'s Ex. 13, Letter from Jesse Madison, Executive Vice President, Park District, to Chapman Kelley (June 3, 1988). Kelley responded with a lawsuit in the Northern District of Illinois, No. 88 CV 6619, alleging *inter alia* that his First Amendment rights were being infringed upon. On September 14, 1988, as part of the settlement of that lawsuit, the Park District renewed Kelley's temporary permit for one year. FPTO Stip. ¶ 30, 31; Pl.'s Ex. 14. The 1988 permit did not include the ninety day notice of termination provision of the 1984 permit, *supra*. Pl.'s Ex. 14. It included instead the following provisions:

> The planting material is the property of Mr. Chapman Kelley. If the Chicago Park District does not extend the Permit by September 1, 1989, Mr. Kelley may remove the planting material. If this Permit is not extended by September 1, 1989, the permittees are not required to restore the planted area to its original condition . . . . This agreement does not create an proprietary interest for Chicago Wildflower Works, Inc. [a non-profit

corporation associated with the exhibit], and/or Mr. Chapman Kelley in continuing to operate and maintain the Wildflower Garden Display after September 1, 1989.

*Id.* The 1988 permit was renewed in 1989, 1990 and 1992. Pl.'s Exs. 15, 17, 19; FPTO Stip. ¶ 33, 34.

The last permit renewal expired on September 30, 1994. After its expiration, Kelley did not apply for a permit, and the Park District did not renew the temporary permit. FPTO Stip. ¶ 35-38. From October 1, 1994 until June 9, 2004, Kelley and his volunteers continued to maintain and install plants in Wildflower Works, and the Park District did not remove the installation. *Id.* at ¶ 41. In March of 2004, Kelley attended a lunch meeting with Wildflower Works, Inc. President Jonathan Dedmon, Wildflower Works, Inc. Secretary Maurine Slavin, and Park District commissioner Margaret Burroughs. At the meeting, Dedmon asked Burroughs whether Kelley or Wildflower Works, Inc. needed to file a permit for the exhibit. Burroughs responded something to the effect of, "You're still there, aren't you? That's all you need to do."[4] The others interpreted Burroughs' statement mean that no further action for a permit was required. Trial Tr. vol. 1, 77.

### d. Reconfiguration of Wildflower Works

---

[4] The parties dispute whether Burroughs made this remark, but the weight of the evidence favors Kelley's position. Slavin and Dedman testified, consistent with each other, that Burroughs made the comment. On the other hand, Burroughs testified that she did not say anything to Kelley regarding the permit for Wildflower works, but could not remember other details from the meeting, and could not remember that she had signed an affidavit in the course of this litigation regarding the matter. Trial Tr. vol. 1, 76, Sept. 24, 2007; vol. 2, 276, Sept. 25, 2007; vol. 3, 326-38, Sept. 26, 2007. The Court credits Slavin and Dedman's testimony.

In May of 2004, ongoing issues with the maintenance of Wildflower Works and the oncoming opening of a new adjacent park space prompted the Park District to conclude that changes would have to be made to Wildflower Works. Trial Tr. vol. 2, 293. On June 10, 2004, Kelley met with persons from the Park District who presented plans to reduce the size and to change the shape and design of Wildflower Works. FPTO Stip. ¶ 45. At the meeting, Arnold Randall, then Director of Development and Planning for the Park District, told Kelley that the Park District intended to move forward with the reconfiguration plan but wanted Kelley's input. Trial Tr. vol. 2, 307. Kelley did not approve of either the reconfigured new shape or the design, but did not request to be given an opportunity to remove any of his wildflower plants from Wildflower Works. FPTO Stip. ¶ 47, 49.

Despite Kelley's disapproval, the Park District went forward with the reconfiguration plans. During the summer of 2004, the Park District reduced the wildflower-planted spaces in Daley Bicentennial Plaza from roughly 66,000 square feet to under 30,000 square feet, and reconfigured the two ellipses as rectilinear shapes. The wildflower beds were edged with new evergreen hedges. FPTO Stip. ¶ 46.

2. **CONCLUSIONS OF LAW**

    a. **Jurisdiction and venue are both appropriate.**

Jurisdiction over this action is appropriate under this Court's federal question jurisdiction, pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### b. Wildflower Works is not protected by VARA.

Kelley's first two claims assert his rights under the Visual Artists Rights Act ("VARA"), 17 U.S.C. § 106A. Under that statute, an "author of a work of visual art" is entitled to certain rights of attribution (the right of the artist to be recognized by name as the author of the work) and integrity (the right of the artist to prevent distortion or mutilation of the work), subject to exceptions and limitations. 17 U.S.C. § 106A(a).

To be protected by VARA, an object must (1) meet the statutory definition of "a work of visual art" and (2) be subject to copyright protection. 17 U.S.C. § 101. The Court will consider the two prongs of the analysis separately.

#### i. Wildflower Works is a "work of visual art."

VARA defines a "work of visual art" as, *inter alia*,

> (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author . . .

17 U.S.C. § 101. Kelley advances two theories under which Wildflower Works could be a "work of visual art": the exhibit is either a painting or a sculpture.

Nowhere in the Copyright Act are the terms "painting" or "sculpture" defined. The Park District cites legislative history to support its contention that VARA only applies to a narrow range of artwork, but a closer reading of the cited legislative history reveals only that the speaker was concerned with differentiating *visual art* from films and other kinds of intellectual property. Def.'s Resp. Br. 6, May 31, 2007. Absent a statutory definition or a clearly expressed legislative

intent to the contrary, words are to be given their plain and ordinary meaning. *United States v. Lock*, 466 F.3d 594, 598 (7th Cir. 2006) (citing *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982). However, this Court is loath to take too literalist an approach to determining whether a given object qualifies as a sculpture or a painting. There is a tension between the law and the evolution of ideas in modern or avant garde art; the former requires legislatures to taxonomize artistic creations, whereas the latter is occupied with expanding the definition of what we accept to be art. While Andy Warhol's suggestion that "art is whatever you can get away with" is too nihilistic for the law to accommodate, neither should VARA be read so narrowly as to protect only the most revered work of the Old Masters. In other words, the "plain and ordinary" meanings of words describing modern art are still slippery. With these concerns in mind, the Court turns to the task of determining whether the two elliptical gardens of Kelley's creation could be considered a painting or a sculpture under VARA.

The Wildflower Works exhibit consisted of arrangements of living plants within two elliptical spaces. Those spaces were circumscribed by three feet of gravel and a band of steel edging. At trial, Kelley likened the gravel and metal band in Wildflower Works to the figurative areas in his paintings; indeed, many of Kelley's paintings depict banded elliptical forms enclosing colorful wildflowers. Pl.'s Ex. 2. The display required Kelley and his volunteers to plant, cultivate and prune the wildflowers in the gardens, activities typically associated with landscaping, not art.

Defendant's insistence that an artifact that changes over time, requires ongoing maintenance, or contains living matter cannot be considered a work of visual art protected by VARA is misplaced. The mobiles of Alexander Calder are undoubtedly art, even though the

dynamic forms they create are ephemeral by their nature. An example of art that changes or requires maintenance can be found less than half a mile away from Wildflower Works, in the Art Institute of Chicago, alongside such works as Seurat's "Sunday Afternoon on the Island of La Grande Jatte" and Van Gogh's "Bedroom at Arles." Felix Gonzalez-Torres' "Untitled (Portrait of Ross in L.A.)" consists of 175 pounds of individually-wrapped multicolored candies laid on the floor of the museum. Viewers are invited to take candies from the artwork, which is intended to represent the weight loss due to illness of the artist's partner, who died of causes related to AIDS. The candy pile dwindles each day; each morning, the candies are replenished by museum staff. Although arguably no two viewers of "Untitled (Portrait of Ross in L.A.)" see the same work, there is no argument that its mutability precludes it from being described as a work of art. Finally, this Court will not conclude that such an arrangement of living plants can never be a work of visual art *per se*; Jeff Koons' "Puppy," a 43-foot flowering topiary, comes to mind.

(1)  *Wildflower Works as sculpture*

According to one common dictionary, a sculpture is "a work of art created by the practice of shaping figures or designs in the round or in relief, as by chiseling marble, modeling clay, or casting in metal." The American Heritage Dictionary of the English Language (4th Ed. 2004). Another dictionary defines a sculpture as the "[1] action or art of processing (as by carving, modeling, or welding) plastic or hard materials into works of art**:** [2] work produced by sculpture, [or] [3] a three-dimensional work of art (as a statue)." Merriam-Webster's Online Dictionary, http://www.m-w.com/dictionary/sculpture (last visited September 25, 2008). Kelley's expert witness Jane Jacob, a fine art advisor and appraiser and a professor of art history

at New York University, testified that "since World War II and since the 1960s in particular, sculpture [has been] defined as any non-two dimensional art form . . . including environmental art and some conceptual art." Trial Tr. vol. 1, 15-16. At a minimum, the manipulation of the flowers, metal, and gravel into an elliptical shape fits within the broadest of the definitions of sculpture cited above. Accordingly, this Court finds that Wildflower Works is a sculpture within the definition of VARA.

(2)  *Wildflower Works as painting*

Jacob also testified that she considered Wildflower Works to be a painting, under her definition of a painting as "two dimensional representations, where a picture is executed by applying colored matter to various surfaces as decoration, among other things . . . ." Trial Tr. vol 1, 18. She noted that while Wildflower Works appeared as a garden from ground level, it was conceived as a painting to be viewed from a height, and that many paintings are, in fact, three dimensional. *Id.* This Court need not pass on Jacob's strange assertion that three dimensional objects become two dimensional paintings when viewed from airplanes, because a widely-used dictionary offers a more accommodating definition of "painting." According to Merriam-Webster, to "paint" is " [1] to apply color, pigment, or paint to . . . [2] to produce in lines and colors on a surface by applying pigments, [3] to depict by such lines and colors, [4] to decorate, adorn, or variegate by applying lines and colors." Merriam-Webster's Online Dictionary, http://www.m-w.com/dictionary/paint[1] (last visited September 25, 2008). An exhibit that corrals the variegation of wildflowers in bloom into pleasing oval swatches, as Wildflower

-10-

Works did, could certainty fit within some of the above definitions of a painting. Accordingly, Wildflower Works could be considered either a painting or a sculpture under VARA.

        ii.        **Wildflower Works was not copyrightable.**

An object is subject to copyright protection if it is an

> original [work] of authorship fixed in any tangible medium of expression, now known or later developed, from which [it] can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102. "Works of authorship include . . . (5) pictorial, graphic, and sculptural works . . . ." *Id.* Excluded from copyright protection is "any idea, procedure, process, *system*, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (emphasis added).

For the same reasons that it can be considered a painting or a sculpture under the definition of "work of visual art" under 17 U.S.C. § 101, Wildflower Works qualifies as a "pictorial, graphic, and sculptural [work]." However, the Park District challenges the copyrightability of Wildflower Works on three grounds: it contains living elements, so it cannot be "fixed in a tangible medium of expression"; Kelley has described it as a "vegetative management *system*," Trial Tr. vol. 3, 382 (emphasis added), so it is excluded under 17 U.S.C. § 102(b); and it is not an "*original* work of authorship."

On the last point, this Court agrees with the Park District. It is not clear what about the exhibit is original. Is it the elliptical design? The size? The use of native instead of non-native plants? The environmentally-sustainable gardening method to which "vegetative management

-11-

system" apparently refers?[5] Kelley leaves this Court to assume that he is the first person to ever conceive of and express an arrangement of growing wildflowers in ellipse-shaped enclosed area in the manner in which he created his exhibit. He has submitted no evidence or argument on the copyrightability of Wildflower Works, except for the conclusory, tautological statement that "Wildflower Works is copyrightable under the Copyright Act because the arrangement, coordination or selection displayed by Plaintiff is copyrightable." Pl.'s Proposed Findings of Fact and Conclusions of Law 40. Without any evidence differentiating Kelley's work from, for example, the oval wildflower beds of Monticello, *see* http://www.monticello.org/gardens/flower/ovalbeds.html, this Court can only find that Wildflower Works is not subject to copyright protection. Therefore, it is not protected under VARA.

      iii.    **Even if Wildflower Works was copyrightable, it would still not be protected under VARA because it is site-specific.**

Even if Wildflower Works was copyrightable, it would not be protected by VARA because the statute does not protect "site-specific" art. *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir. 2006). Site-specific art is artwork in which "one of the component physical objects is the location of the art." *Id.*, 459 F.3d at 129. According to Kelley's expert Jane Jacob, "Site-specific art usually takes into consideration the natural environment in which a

---

[5] If indeed the only original element of Kelley's exhibit was this "vegetative management system," then Wildflower Works would be excluded from copyright protection under 17 U.S.C. § 102(b).

-12-

work of art is installed. It could be anything from a mural that is put into a public building, to a lobby in a hotel, to a hill." Trial Tr. vol. 1, 34.

VARA is silent on the issue of site-specific art. There are few published decisions dealing with VARA; the Seventh Circuit has only published two decisions on the statute. No court in this circuit has dealt with the issue of VARA's coverage of site-specific art. This Court will therefore follow the persuasive reasoning set forth by the First Circuit in *Phillips*. In that case, an artist sued to prevent the removal of his artwork from a public park. The artwork at issue integrated the artist's sculptures with the large granite stones of the park and the nearby granite sea walls of Boston harbor. 459 F.3d at 137. The district court held that VARA protected such site-specific artwork from alteration or distortion, but that under the public presentation exception at 17 U.S.C. § 106A(c)(2), the defendant could move the artist's sculptures to a different location. The First Circuit disagreed with the district court's reasoning, because "the removal of a site-specific work from its location necessarily destroys that work of art." 459 F.3d 129. Instead, the First Circuit concluded that VARA does not protect site-specific art at all.

Wildflower Works is clearly a site-specific artwork. Kelley admitted at his deposition that it was site-specific. Trial Tr. vol. 3, 383. Kelley's expert Jane Jacob stated unequivocally that Wildflower Works was site-specific. Trial Tr. vol. 1, 34 ("Q: Mr. Kelley's work is site-specific, isn't it? A: Yes, it is. It is site-specific, yes."). In addition, the theoretical concepts that motivated Kelley's design and placement of Wildflower Works required that it be placed in Grant Park; Kelley wanted a location that would create a contrast between the linearity of the urban grid, the rondure of the elliptical gardens, and the entropy of the wildflower beds. FPTO Stip. 25; Trial Tr. vol. 1, 91-93; vol. 2, 251. Before choosing the location, Kelley hired

helicopters and airplanes so that he could survey Chicago from the air, and drove around the city extensively to find a place that would be express his artistic vision. Trial Tr. vol. 2, 247-48. In Grant Park, the gardens were set against a backdrop of Chicago's skyscrapers and grid system. Prior to the first lawsuit, the Park District and Kelley discussed relocating the exhibit, but Kelley rejected all other locales as incompatible with his artistic vision for the exhibit. Trial Tr. vol. 2, 251-52.

Finally, Wildflower Works incorporated pre-existing elements of the environment into its display. It is situated on the roof of the East Monroe Street Parking Garage. Air vents from the garage were incorporated into the artwork: each ellipse had three large square vents spaced evenly along its major axis, which worked as figurative elements in the "painting" just as the band of gravel and steel around the ellipses did. Kelley testified that he designed Wildflower Works around those vents:

> Q: When you did Wildflower Works, when you did that, did you design it to include those air ducts?
>
> Kelley: Well, of course, yes, they were part of it. They were considered because I wouldn't have done it there if I couldn't have, you know, included them as part of it . . . . So they became, in essence, I guess, a certain element.

Trial Tr. vol. 1, 123. Therefore, Wildflower Works was site-specific and not protected under VARA.

Because the Court concludes that Wildflower Works is both site-specific and not copyrightable and therefore not protected under VARA, it needs not reach the Park District's additional arguments that Kelley waived his VARA rights or that Wildflower Works is a work installed on a building before 1991 and therefore not subject to VARA protection.

-14-

### c. Commissioner Burroughs' statement created an implied contract, which was breached by the Park District.

In his final claim, Kelley contends that the Park District breached a contract between the parties by failing to provide reasonable notice to Kelley regarding the reconfiguration of Wildflower Works. The final temporary permit expired in 1994, so this Court presumes that Kelley advances some sort of implied contract theory based on prior course of dealing to support this claim.

In a contract implied in fact, a contractual duty is imposed by reason of a promissory expression inferred from facts, circumstances and expressions by the promisor showing an intent to be bound. *In re Estate of Milborn*, 461 N.E.2d 1075 (Ill. App. Ct. 1984). Such contract may be proved by circumstances showing that the parties intended to contract and by the general course of dealing between them. However, there can be no promise implied where the relation between the parties excludes the inference that they were dealing on a footing of contract. *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 519 N.E.2d 1005, 1008 (Ill. App. Ct. 1988). Under Illinois law, "no contract or liability may be implied against a municipal corporation where there has been a failure to comply with a statute or ordinance prescribing the method by which an officer or agent can bind such corporation by contract." *Id.*, 519 N.E.2d at 1007 (citation omitted). The City of Chicago's power to contract is limited by law; only "corporate authorities" can execute contracts that bind the municipal entity unless there has been an express delegation of that power. *Chicago Food Mgmt. v. City of Chicago*, 516 N.E.2d 880 (Ill. App. Ct. 1987); 65 ILCS 5/2-2-12.

The Park District argues that under 70 Ill. Comp. Stat. 1505/7.01, which delineates the powers of the Park District, only the Board of Commissioners of the Park District (rather than

the commissioners individually) has the power to issue a renewal permit involving more than a limited, short-term use of Park District property. But the statute actually provides that "[t]he *commissioners* of such district constitute the *corporate authorities* thereof, and have full power to manage and control all the officers and property of the district, and all parks, driveways, boulevards and parkways maintained by such district or committed to its care and custody" (emphasis added). From the language of the statute it is possible that because Burroughs was a commissioner, she was a "corporate authority" capable of binding the Park District in contract and she could do so orally.[6] *See Chicago Food Mgmt. v. City of Chicago*, 516 N.E.2d 880. An implied agreement to extend the date of the temporary permit was therefore created when Burroughs told Kelley, "You're still there, aren't you? That's all you need to do" when queried about the state of the permit for Wildflower Works.

Even though the post-1988 permits did not include the ninety day notice provision, they did provide Kelley the right to remove his wildflowers upon the expiration of the permits. Accordingly, under the implied permit extension, the Park District should have given Kelley reasonable time to remove his wildflowers. Based on the terms of the first permit, this Court finds that ninety days would have been a reasonable time for the removal of those plants. Because the Park District did not provide the requisite ninety days, it is in breach of the implied contract.

---

[6] Notwithstanding the statute, the record is unclear as to whether a Parks District commissioner indeed has the power to act unilaterally in granting an extension of a permit. If not, Kelley's contract claim fails; if so, Kelley's claim for damages under the contract claim still fails for reasons discussed below.

### i. **Kelley did not prove his damages to a reasonable degree of certainty.**

Although he is entitled to damages under Count IV of the complaint, Kelley failed to meet his burden of proving the amount of his damages to a reasonable degree of certainty. *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995 (7th Cir. 2002) ("While we have no problem with the basic premise that uncertainties as to damages should be resolved against the wrongdoer, this does not give an injured party carte blanche to provide wild guesses at its damages. A reasonable estimate . . . must be grounded in some record evidence, not numbers pulled from thin air.") (citations omitted). When a party establishes that it is entitled to damages but fails to prove the amount of those damages to a reasonable degree of certainty, a trial court may award the plaintiff only nominal damages. *Fidelity Ins. Agencies v. Citizens Cas. Co of New York*, 194 F.2d 43, 47 (7th Cir. 1952). Kelley has not sought nominal damages.

Kelley seeks damages in "compensation for the materials removed by the Park District." Compl. ¶ 54. The measure of damages would therefore be the value of the plants that Kelley could have removed, less the costs of removal. The only evidence adduced by Kelley with regard to the issue of damages was presented by his expert witness J. Randall Ismay, who calculated the total cost of wildflower plugs required to fill 66,000 square feet to be $1.5 million, based on his estimate of the amount of wildflowers in a square inch or square foot of soil. However, Ismay's evaluation fails to take into account the approximately 30,000 square feet of Kelley's wildflowers that remain in Grant Park, the percentage of Wildflower Works that had been overtaken by invasive weeds by 2004, the wildflowers removed during the garden's reconfiguration but replanted afterward, or the cost to Kelley of removing and transporting those wildflowers for which he seeks damages today. The last factor alone could have proved more

costly to Kelley than the value of all of his wildflowers. Given Kelley's failure to provide evidence to dispel these unknowns, this Court concludes that he has not proven his damages to a reasonable degree of certainty.

3.  **CONCLUSION**

After carefully reviewing the evidence in this case, this Court concludes that judgment on Counts I and II will be entered in favor of Defendant, and Count IV for breach of contract will be entered in favor of Plaintiff. Nominal damages in the amount of one dollar will be awarded on Count IV.

Entered:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **September 29, 2008**